Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ruben Castillo | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 98 C 7627 | **DATE** | 5/2/2000 |
| **CASE TITLE** | Sharon Swarsensky - Bilow vs. Much Shelist Freed Denenberg Ament & Rubenstein | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due _____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)   ☐ General Rule 21   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Defendant's motion for summary judgment [43-1] is granted. Defendant's motion to strike and for other relief [52-1, 52-2] is denied as moot. Judgment is entered in favor of defendant and against plaintiff. This case is dismissed with prejudice.
(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | **Document Number** |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | MAY 03 2000 | |
| | Notified counsel by telephone. | | date docketed | 54 |
| ✓ | Docketing to mail notices. | | | |
| ✓ | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| RO | courtroom deputy's initials | | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

SHARON SWARSENSKY BILOW, )
) No. 98 C 7627
Plaintiff, )
)  Judge Ruben Castillo
v. )
)
MUCH SHELIST FREED DENENBERG )
AMENT & RUBENSTEIN, P.C., )
)
Defendant. )

## MEMORANDUM OPINION AND ORDER

This lawsuit was commenced by a female lawyer, Sharon Swarsensky Bilow, against her former law firm, Much Shelist Freed Denenberg Ament & Rubenstein, P.C. ("Much Shelist" or "the Firm"), after it terminated her employment. On October 18, 1999, this Court granted in part and denied in part the defendant's motion to dismiss the federal claims in Bilow's complaint. *Bilow v. Much Shelist Freed Denenberg Ament & Rubenstein, P.C.*, 67 F. Supp.2d 955 (N.D. Ill. 1999) ("*Bilow I*").[1] The federal claims remaining after *Bilow I* are Bilow's allegations that Much Shelist engaged in discriminatory staffing of its cases and that Much Shelist fired her in retaliation for complaining about sex discrimination. Additionally, all of Bilow's state law claims remain: one count of tortious retaliatory discharge and six counts relating to salary and bonus issues. At the close of discovery, Much Shelist filed the motion for summary judgment currently before the Court, seeking resolution in its favor on all of Bilow's remaining claims. Also before the Court is Much Shelist's motion to strike portions of Bilow's "Affidavit and Statement of Additional Facts."

---

[1] We assume familiarity with *Bilow I* and will not needlessly repeat issues raised there.

After carefully reviewing the record, we grant Much Shelist's motion as to Bilow's federal claims and decline to exercise our discretionary jurisdiction over her state law claims. Finally, we deny Much Shelist's motion to strike as moot.

**FACTS**

In summary judgment proceedings, we must view the facts in the record in the light most favorable to the nonmovant, in this case Bilow, and make all reasonable inferences in her favor. Recently, in *Malec v. Sanford*, – F.R.D. – , 2000 WL 267776 (N.D. Ill. Mar. 7, 2000) (decided after Much Shelist filed its summary judgment motion, but three weeks before Bilow responded), we had occasion to discuss the proper method – according to the Federal Rules of Civil Procedure, the Local Rules, and pertinent caselaw – for a nonmovant to establish record facts. *See Malec*, 2000 WL 267776, at *1-4.

Unfortunately, Bilow did not conform her responses to Much Shelist's factual assertions or her presentation of additional facts to *Malec* and its sources. For example, Bilow filed a single document titled "Affidavit of Sharon Swarsensky Bilow and Statement of Additional Facts" ("affidavit/statement"). That document fails to accomplish either of its designated tasks. Myriad allegations contained therein are not made on personal knowledge and, thus, are inappropriate in an affidavit. (*See, e.g.*, ¶¶ 18, 21, 26 -30, etc.) As a statement of fact, the document violates every single standard dictated by the Local Rules and case precedent: it purports to establish the factual contentions in Bilow's severely overpled complaint by adopting that complaint, (¶ 2); it asserts multiple complex facts in almost every single paragraph, (*e.g.*, ¶¶ 9-13, 16, 18-20, 22-24, 27-28, 30-35, etc.); it presents factual and legal arguments, (*e.g.*, ¶ 28, 33, 37, 40, 61-64, 67-68);

Page 2

it does not cite specific references to supporting evidence, (*see, e.g.*, ¶¶ 48-63); and it asserts wholly irrelevant, and sometimes scurrilous, matters, (*e.g.*, ¶ 93).

Furthermore, Bilow's Rule 56.1(b) response to Much Shelist's statement of facts violates the Local Rules, which, "in the case of disagreement, requires specific references to the affidavits, parts of the record, and other supporting materials relied upon." Rule 56.1(b)(3)(A). Instead of relying on record materials to support her denials, Bilow cites either (1) her memorandum in opposition to summary judgment; (2) paragraph two of her affidavit/statement, which purportedly adopts her complaint; or (3) other parts of her affidavit/statement that are either irrelevant to the challenged fact or unsupported by personal knowledge or other evidence. Finally, Bilow presents additional unsupported facts, which are never mentioned in her affidavit/statement or response to Much Shelist's statement, in her supporting memorandum. As a result of these and other deficiencies in Bilow's summary judgment pleadings, many of her factual allegations simply are not established. Where relevant to her position, we will note the evidentiary problem.

In 1982, Much Shelist hired Bilow and, three years later, promoted her to income partner. Bilow was a member of the Firm's litigation department, headed by equity partner Michael Freed. In 1992, Freed assigned Bilow to work on *Brouwer v. Rochwarger*, a contingency fee, RICO class action lawsuit filed in the United States District Court in Indianapolis, Indiana, against various entities and individuals, including professional accounting firms, lawyers, and brokerage firms, that allegedly conspired to defraud the plaintiffs via a Ponzi scheme. Shortly

Page 3

after being assigned *Brouwer*, Bilow requested assistance with the case and Freed assigned Christopher Stuart, at that time a Much Shelist associate, to help her.[2]

By the end of 1997, Bilow had billed almost 6,000 hours to the *Brouwer* case, and Stuart had billed over 5,300 hours. By then, the Firm had invested approximately $3,000,000 of attorney time in the case, but recovered only about $800,000 in fees through settlement with some of the *Brouwer* defendants. The Firm's Management Committee became concerned about the likelihood of recovering even a portion of the remaining expense and scheduled a meeting with Freed to discuss the matter in early 1998.[3]

At the meeting, Freed told the Committee that Bilow and Hugh Baker, local counsel for the *Brouwer* plaintiffs, could adequately litigate the case, scheduled to begin in May 1998, themselves. Freed based his opinion that Bilow and Baker could try the case alone on several factors: most of the named defendants had settled or been dismissed; the potential recovery against one of the remaining defendants was not substantial and did not warrant more attorney time; he respected Baker's experience as a seasoned trial lawyer; and he had confidence in

---

[2] Bilow denies paragraph 13 of Much Shelist's Rule 56.1 statement, in which the Firm alleges "Shortly after being assigned the Brouwer case, Bilow asked Freed to assign another lawyer from the Firm to assist her. Freed accommodated her by assigning Christopher Stuart." However, Bilow's only support for the denial is paragraph 2 of her affidavit/statement, which adopts the complaint, and a portion of her opposition memorandum, which, of course, is not evidence. Neither the complaint nor memorandum is sufficient to challenge the assignment of Stuart to the *Brouwer* case. Further, Bilow admits that Stuart billed more than 5,000 hours of work to the *Brouwer* case. (Bilow Affidavit/Statement at ¶ 18.)

[3] Bilow relies on paragraph 25 of her affidavit/statement to deny the facts in this sentence. (Bilow's Resp. to Much Shelist's Statement of Material Facts ¶ 20.) Paragraph 25 discusses an accounting expert hired by the Firm for *Brouwer*; it has nothing to do with whether the Management Committee was concerned about mounting costs and scheduled a meeting with Freed to address that concern.

Bilow's ability as a litigator.[4] The Committee decided that Bilow and Baker would litigate the case themselves in Indianapolis, but that Stuart and others would be available to provide assistance from Chicago. On February 26, 1998, the Committee, in a memo, informed Bilow of its decision. (Second Am. Compl. Ex. V, Feb. 26, 1998 Memo.[5])

The next day, Bilow responded to the Committee's memo with one of her own. (Second Am. Compl. Ex. W, Feb. 27, 1998 Memo.) In her memorandum she objected to the staffing decision on the grounds that she would be unable to stay in Indianapolis for the duration of the trial due to child care problems, that the earliest daily flight to Indianapolis would not enable her to be present each morning before trial began, and that in her opinion Baker could not properly question witnesses.[6]

The Committee appointed two of its members, Michael Shelist and Michael Hyman, to meet with Bilow. That meeting occurred on March 10, 1998. At the meeting, Bilow further described her child care problems: at the time, her husband worked nights and she was unable to

---

[4] Bilow challenges the factual accuracy of whether the settlements in fact simplified the *Brouwer* case. That, however, is not the issue. The issue is whether Freed believed the settlement simplified the case and whether this belief informed his judgment that Bilow and Baker could try the case without additional assistance.

[5] Bilow's Rule 56.1 submissions improperly rely on documents she improperly attached to her complaint. *See Bilow I*, 67 F. Supp.2d at 960 (discussing impropriety of attaching "evidence" to complaint). Despite the double gaffe, we will consider the documents attached to Bilow's complaint as evidence in support of her opposition to summary judgment.

[6] Bilow denies the allegations in Much Shelist's statement, paragraph 23, regarding her Feb. 27 memo and cites the memo. (Bilow's Response to Much Shelist's Statement of Material Facts ¶ 23.) We do not understand her objection to those allegations, however, because they precisely mirror what the memo says. As we said in *Malec*, "[i]f the cited material does not clearly create a genuine dispute . . . the nonmovant should provide an explanation." – F.R.D. –, 2000 WL 267776, at *3.

find a suitable nanny or babysitter. Bilow again suggested that she could commute daily to Indianapolis and opined that the *Brouwer* Judge would not object to her appearing late to trial on a daily basis. Shelist and Hyman did not agree that commuting daily to the trial was a viable option.

The meeting ended in an impasse: Bilow told Shelist and Hyman that what they were asking her to do was impossible and that, even if the Firm were to fire her, she could not do it. Bilow understood, however, that the Firm intended her to follow its instruction to stay in Indianapolis during the upcoming trial. But she believed that, because the Firm was demanding she stay in Indianapolis during the trial, the Firm bore responsibility for arranging child care. Disaster was averted when, as had happened before, the May trial date was continued.

Shelist and Hyman reported back to the Committee, which asked Shelist to commemorate the incident. The Committee members shared the view that Bilow was being insubordinate.[7] Thus, on April 29, 1998, almost two months after the March 10 meeting, Shelist prepared a memorandum recording the events surrounding the conflict. (Second Am. Compl. Ex. U, Apr. 29, 1998 Memo.)

During this time the Firm conducted a non-anonymous survey of its partners. Bilow completed the survey on March 20, 1998. (Second Am. Compl. Ex. AA, Bilow's Partner Attitude and Perception Survey.) In response to the Firm's request to list her "three most significant concerns," Bilow first complained about her compensation and then "[t]hat there is a

---

[7] Bilow denies that the Committee members believed she was being insubordinate. (Bilow's Response to Much Shelist's Statement of Material Facts ¶ 28.) Again she relies on her affidavit/statement ¶ 2 (adopting the complaint) and her memorandum: neither constitutes adequate evidence regarding the Committee members' beliefs.

ruling class at the firm and a ruled class and all the women in the firm are in the ruled class." (*Id.* Ex. AA, Survey, question #6.) She did not list a third concern. Completed surveys, including Bilow's, were returned to Michael Shelist.

In May 1998, the Management Committee decided to lay-off one senior-level attorney from its litigation department and one from its corporate department. The Committee chose Thomas Egan, an income partner in the Firm's corporate department, and Bilow from the litigation department. Before the Committee made its decision to fire Bilow, it consulted Freed. Freed told the Committee that Bilow's absence would not hamper the *Brouwer* proceedings and that he personally "did not wish to work with [Bilow] again because [he] found working with her to be extremely frustrating due to her obstinate nature and frequent disregard of his counsel." (Much Shelist Summ. J. App. 1, Freed Aff. at ¶ 21.) Bilow claims that she did not disregard Freed's counsel, but does not dispute that he told the Committee that she did.

On June 1, 1998, Shelist told Bilow that her employment at the Firm was being terminated. He told her that there was insufficient work in the litigation department to keep all of the senior litigators busy and that she had been chosen because she was unwilling to try the *Brouwer* case as instructed by the Firm. (Bilow's Response to Much Shelist's Statement at ¶ 32.) On June 25, 1998, Shelist delivered a proposed separation agreement to Bilow, in which the Firm agreed to pay Bilow sixteen weeks of salary and an additional $16,600 for disputed previously unpaid "add-ons" (referred to as the "gross up" in *Bilow I*) in exchange for her release of all potential claims against the Firm. (Second Am. Compl. Ex. L, Letter from Shelist to Bilow of June 22, 1998.) Additionally, under the terms of the proposed agreement, Bilow was required to assist "in the transition of the Virginia Brower [sic] litigation and to prepare a memo as to the

Page 7

status of all outstanding matters concerning the litigation." (*Id.* at ¶ 7.) The letter stated that Bilow's last day of employment was June 8, 1998. (*Id.* at ¶ 1.)

Bilow did not immediately respond to the proposed separation agreement; therefore, Shelist gave her a deadline of July 9. Bilow asked for more time, and Shelist extended the deadline to July 13. Instead of responding, on July 15, Bilow sent Shelist a memorandum with several questions regarding her salary and benefits and requesting copies of various documents. (Second Am. Compl. Ex. M, Letter from Bilow to Shelist of July 15, 1998.) Shelist replied immediately that Bilow's memo did not constitute a response to the separation proposal and that, if no agreement was signed, the Firm would discontinue her salary payments and apply all of the payments made to Bilow since June 8 to the gross-up amount. (Second Am. Compl. Ex. N, Letter from Shelist to Bilow of July 20, 1998.) Bilow did not respond in any way to Shelist's July 20 communication, so on August 12 Shelist sent Bilow a letter implementing the threats from his July 20 letter. He included a check for the outstanding gross-up amount minus the pay she had received since June 8, 1998. In the meantime, on August 10 Stuart settled the *Brouwer* case against the remaining defendants.

Bilow now maintains that she worked regularly during June and July of 1998, but admits that she billed only 3.60 hours after June 1, 1998. She asserts that she was doing "transition work" on the *Brouwer* case and collecting information for the Firm's defense in a malpractice suit against it and Bilow. She also claims that, on June 1, Shelist did not make it clear that her employment was being terminated as of that day (or June 8, which was the last day of that pay period). According to Bilow, had she known the termination was effective immediately she would have immediately discontinued working.

Page 8

## ANALYSIS

To survive Much Shelist's summary judgment motion, Bilow must present evidence creating a genuine issue of fact on each element of her claims for which she bears the burden of proof at trial. *Miller v. American Family Mut. Ins. Co.*, 203 F.3d 997, 1003 (7th Cir. 2000). "This means that [Bilow] must do more than raise a metaphysical doubt as to the material facts. Rather, she must come forward with specific facts showing that there is a *genuine issue for trial.*" *Id.* (quotations & citations omitted) (emphasis in original).

Bilow claims that the Firm discriminated against her in its staffing decisions and that it fired her in retaliation for complaining about discrimination. Additionally, she sets forth several state law claims. We address each claim in turn.

### A. Much Shelist's Allegedly Discriminatory Staffing Decisions

A plaintiff may prove sex discrimination using two methods: she may produce direct evidence of discrimination, or she may rely on the burden-shifting method of proving discrimination. Much Shelist contends that Bilow has no direct evidence of discrimination. (Much Shelist Mem. at 4.) Bilow does not contest this statement and, thus, has waived it.[8]

---

[8] Of course, Bilow does not respond directly to any of Much Shelist's arguments, nor does she organize her arguments in any coherent fashion: she eschews legal standards altogether and not once does she conform her argument to the well-established analytic framework for Title VII and retaliation cases. Instead, she delivers a tirade on paper apparently in the belief that her repeated condemnation of her treatment by the Firm is sufficient to withstand summary judgment.

In any event, although we disagree that Bilow has not alleged direct evidence of sex discrimination by equity partners at the Firm, her direct evidence is insufficient to sustain her claim against the Firm. Specifically, Bilow alleged that Joseph Ament, the head of Much Shelist's accounting committee, wrote a letter to members of his synagogue objecting to the practice of women leading religious services. (Second Am. Compl. ¶ 91) Bilow, a member of

(continued...)

Under the *McDonnell Douglas* burden-shifting method of proving discrimination, Bilow must establish a prima facie case of discrimination including, among other things, showing that similarly situated men were treated better than she was treated. If she succeeds, Much Shelist must articulate a legitimate, nondiscriminatory reason for its decisions. If the Firm satisfies its burden, Bilow must come forward with evidence that Much Shelist's articulated reason is a pretext for sex discrimination. *See Simpson v. Borg-Warner Automotive, Inc.*, 196 F.3d 873, 876 (7th Cir. 1999) (articulating burden-shifting framework). Much Shelist contends that Bilow has presented no evidence that male employees received better treatment than Bilow and that, even if she could, Bilow cannot show that Much Shelist's articulated reason for its staffing decision was phony.

### 1. Differential Treatment of Similarly Situated Male Employees

Bilow complains that the Firm discriminated against her by requiring her to try the *Brouwer* case "essentially alone," but never requiring male employees to try similarly complex cases without help. She does not, however, produce facts from which a reasonable fact-finder could conclude that men were treated better by the Firm in terms of staffing decisions. Initially we note that Bilow has not established the "complexity" of the *Brouwer* case – she merely invokes RICO (without citation) as if that proves the fact. Likewise, she was not required to try

---

[8](...continued)
Ament's synagogue, received her copy of the letter via inter-office mail. Unfortunately, although such a letter could constitute direct evidence of sex discrimination by a member of the Firm, Bilow relies exclusively on her complaint in support of this allegation, (Bilow Mem. at 3): she has not made the letter part of the record. Furthermore, she gives absolutely no details – we don't even know when this incident took place. Finally, Bilow does not claim that Ament played any role in any staffing or termination decisions.

the case alone because, regardless of her opinion of his skills, Baker would in fact be present. Finally, Bilow agrees that, prior to the scheduled trial, she and Stuart both worked almost exclusively on *Brouwer*; she does not complain that she had inadequate support while preparing the case in Chicago.

The vast majority of Bilow's "facts" purportedly showing differential treatment of women are irrelevant (and unsupported by evidence) to the staffing issue of which she complains. For example, Bilow alleges that male partners received Firm support to write books and present seminars; she does not allege that she wanted to write a book (or could not do so without Firm support) or give a seminar. Similarly, she does not argue that the Firm's support of book writing and seminars somehow played a part in its decision that she and Baker try *Brouwer* themselves.[9]

Likewise, Bilow catalogues the female lawyers hired by the Firm and speculates wildly, without an ounce of evidentiary support, on the Firm's motives in hiring them and the reasons they left. (Affidavit/Statement at ¶¶ 50-58.) Finally, Bilow's statement that, in 1989, Michael Shelist engaged in a public tirade after she brought her young son to work (because her babysitter quit) and did not become similarly enraged when male employees brought their children to work, does not address her discriminatory staffing claim. (Bilow's Affidavit/Statement at ¶¶ 61-62.) Even if it did, this single instance of alleged discriminatory treatment by Shelist nine years

---

[9] Even if the Firm based its staffing decisions on who was writing a book or giving seminars, this would seem a reasonable basis for such decisions. However, as Bilow does not argue this point, we need not address it.

before the staffing decision at issue here is insufficient to support her claim that similarly situated male employees were treated better.

Bilow does submit some evidence regarding Much Shelist's staffing of cases. Specifically, she presents billing records from several cases handled by Much Shelist. Unfortunately, none of these cases appears to be similar to *Brouwer* and the distinguishing features justify the differential treatment. For example, all but one of the cases were tried in Chicago: it makes perfect sense that a Chicago firm would have more attorneys available to try cases in Chicago where only fees are at issue – there would be no out-of-pocket commuting or living expenses for the attorneys trying cases in Chicago (unless, of course, a client authorized those additional costs or the Firm believed it was worth it ). The one case that was tried out of town was, in Bilow's own words, a "relatively small and straight-forward [case], taking only a few days, rather than a month or more to try." (Bilow Resp. Mem. at 5 (discussing Bair case).) Additionally, that case was tried by a single Much Shelist attorney with local counsel.[10]

The cases for which billing records are provided differ in other significant ways as well. For example, the Shvartsman case was undertaken pro bono, where the Firm never expected to

---

[10] Bilow briefly mentions that the Powerscreen case was also tried outside of Chicago, but offers no other discussion of that case. (Bilow Resp. Mem. at 4.) The billing records are attached as Bilow Exhibit 4 and show that two attorneys, AC Valiulis and JA Sarasin, conducted that two-week trial in Birmingham, Alabama. However, the Powerscreen billing records do not indicate that it is a contingency fee case – unlike other billing records provided by Bilow, (*see, e.g.*, Bilow Ex. 5, Brown case; Bilow Ex. 6, Brand Name Prescription Drugs case; Bilow Ex. 7, Shvartsman Case.). This suggests that the Powerscreen case differs from *Brouwer* in that Much Shelist was being paid. Obviously, if Much Shelist is being paid, it need only be concerned with costs to the extent that its client is concerned with costs. In any event, Bilow does not establish that the male attorneys who tried the Powerscreen case were similarly situated in relation to her and the *Brouwer* case.

make money and, in any event, expended only 73 attorney hours – as opposed to *Brouwer*, where the Firm expected to make money and expended at least 11,300 attorney hours. (*See* Bilow Ex. 7, Shvartsman Records; Bilow Resp. Mem. at 4 (describing Shvartsman as "a *pro bono* case."))

Finally, the Kaplan billing records do not establish that the client stopped paying Much Shelist's fees during trial or that the client ended up owing Much Shelist $1.2 million, as Bilow avers. (Bilow Resp. Mem. at 4, *citing* Ex. 18.) Exhibit 18, which is a single page of Kaplan's response to Much Shelist's request to admit, read in the light most favorable to Bilow, shows that Much Shelist may have sued Kaplan for $640,179.60 in overdue fees and disbursements. Again, the male attorneys trying Kaplan's case were not similarly situated to Bilow: Kaplan was a fee-for-service client, whereas the *Brouwer* plaintiffs were represented on a contingency fee basis. These two fee structures involve entirely different considerations for a law firm.

In sum, Bilow has not presented evidence of similarly situated male attorneys who were treated better than she was treated. Therefore, she has not demonstrated a prima facie case of sex discrimination in Much Shelist's staffing decision.

### 2. Pretext

Even if Bilow could establish a triable issue that similarly situated male employees received more trial support than she did, she does not submit evidence that Much Shelist's reasons for its staffing decision in *Brouwer* were phony or a pretext for sex discrimination. The Firm's Management Committee, having discovered the Firm's $3 million investment in *Brouwer* with only an $800,000 return after several defendants had been dismissed, decided to cut its losses if possible by limiting additional expenditures of attorney time. It made its decision that Bilow and Baker could try the case themselves based on Freed's recommendation, which in turn

Page 13

was based on his belief that the case had been simplified by the dismissal of several defendants; the case against the remaining defendants was not strong and the potential recovery not great; Baker was an experienced trial lawyer; and Bilow was also a good litigator.

Bilow does not even try to challenge the Management Committee's underlying reason for determining that she and Baker should try *Brouwer* themselves; namely, its concern that the Firm could not recoup its investment in the case and therefore had to minimize future costs. Additionally, she does not challenge the Committee's reliance on Freed's recommendation. Rather, she maintains that two of Freed's four reasons for approving the plan were false. Specifically, she claims the dismissal of several defendants did not simplify the trial issues and maintains that Baker's litigation abilities were inadequate.[11]

If Freed's recommendation to the Committee was motivated by discriminatory animus, then, even if Bilow cannot show discrimination by the Committee itself, she could survive summary judgment. *See, e.g., Maarouf v. Walker Mfg. Co.*, – F.3d –, 2000 WL 369903, at *3-4 (7th Cir. Apr. 12, 2000) (a plaintiff can establish pretext by showing discriminatory animus on the part of an employee whose input influences the decision of a nondiscriminating decision-maker). However, Freed offered multiple reasons underlying his recommendation and Bilow attacks only two: she, therefore, has not established pretext. *Ghosh v. Indiana Dep't of Envtl. Management*, 192 F.3d 1087, 1093-94 (7th Cir. 1999) ("When the defendant offers multiple reasons for its employment decision, the plaintiff must show that all of the proffered reasons are pretextual.").

---

[11] Bilow does not argue these contentions in her memorandum; they are found only in her affidavit/statement.

Page 14

In any event, Bilow has not produced evidence showing that Freed's reasons for approving the *Brouwer* litigation plan were false, much less motivated by sex discrimination. As to her claim that the *Brouwer* issues were not simplified, she says only that "[i]n order to avoid collateral estoppel at a later point in the litigation, we had to prevail at trial with respect to all the issues concerning them [the remaining defendants]." (Bilow Affidavit/ Statement at ¶ 20.) First, this bald statement tells us nothing about the actual issues, their level of difficulty, or how the issues differed pre- and post-dismissal. Second, the statement is simply nonsensical legally.[12] Finally, Bilow's belief about the legal difficulty of the *Brouwer* trial is irrelevant; Freed's belief is what matters and Bilow has not submitted any evidence that his reported belief was not actual.[13] As to Bilow's opinion regarding Baker's litigation skills, again, she has submitted no evidence that Freed's belief was false. Instead, she has shown only that she disagreed with Freed's assessment.

In sum, Bilow has not established a genuine issue that similarly situated male employees were treated more favorably than she was treated or that Much Shelist's stated reason for its

---

[12] Collateral estoppel, or issue preclusion, refers to relitigating issues that were already litigated in a separate legal action. Whether a party wins or loses at trial in the first suit is irrelevant to whether that party can litigate the same issue in a different lawsuit. Obviously, if the *Brouwer* plaintiffs lost at trial, they could appeal; they could not, however, bring a new lawsuit challenging the result of the first trial.

[13] In paragraph 21 of her affidavit/statement, Bilow claims that Freed was constantly denigrating Baker to her and Stuart but, at the risk of sounding like a broken record, submits no evidence in support. She neither identifies the allegedly "denigrating remarks" nor provides an affidavit from Stuart corroborating her bald assertion. In fact the only specifics provided by Bilow regards Freed's wonderment that a sole practitioner like Baker could afford to work on *Brouwer*. We do not see any way, absent extreme contortion, that this statement can be construed as "denigrating" Mr. Baker's abilities.

Page 15

staffing decision was pretextual. For these reasons, we grant summary judgment in favor of Much Shelist on Bilow's discriminatory staffing claim.

## B. Much Shelist's Alleged Retaliation Against Bilow

Bilow claims that the Firm fired her in retaliation for her statement in the partners' survey complaining about sex discrimination: "[T]here is a ruling class at the firm and a ruled class and all the women in the firm are in the ruled class." Much Shelist concedes that the statement is protected and that the termination of Bilow's employment was an adverse action, but argues that Bilow cannot demonstrate a causal connection between the statement and the adverse action. *See Eiland v. Trinity Hosp.*, 150 F.3d 747, 753 (7th Cir. 1998) (prima facie retaliation case requires showing of "causal link"). We agree. Bilow relies exclusively on proximity to establish a causal connection, but "[s]peculation based on suspicious timing alone . . . does not support a reasonable inference of retaliation." *Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 918 (7th Cir. 2000); *see also id.* ("The mere fact that one event preceded another does nothing to prove that the first event caused the second."). Here, the timing is not even particularly suspicious as the decision to fire Bilow was made more than two months after she gave Shelist her completed survey. *Compare with Eiland*, 138 F.3d at 753 n.2 (questioning whether a one month gap between the protected activity and adverse action was sufficient to imply a causal connection).

Additionally, the Firm argues that Bilow has not produced evidence that the Firm's purported reasons for firing her are pretextual. The Firm asserts that, after the Management Committee determined that there was insufficient work to keep all of its senior-level litigators busy, it chose to fire Bilow because she had been insubordinate and unreasonable when facing the *Brouwer* trial dilemma and because Freed assured the Committee that he could handle the

Page 16

*Brouwer* case without Bilow's assistance and that he would be happy never to work with Bilow again.

Bilow produces absolutely no evidence whatsoever that the Firm's stated reason for terminating her employment was pretextual. She presents a flurry of wholly unsupported assertions regarding the Firm's financial standing and prior termination procedures, as well as completely irrelevant statements regarding former clients' opinions of her litigation skills. She does not, however, present evidence creating a triable issue that the Firm lied about its expected work load, that Freed lied about his ability to handle *Brouwer* without her, or that Freed's dislike of her was because of her sex rather than her obstreperousness and, he thought, perverse expectation that the Firm arrange care for her children. Finally, the Firm's post-termination actions do not constitute evidence supporting an inference that the Firm's stated reasons were false. In other words, Bilow has not produced facts demonstrating a triable issue of pretext.

Bilow has not demonstrated a causal connection between her protected expression and the adverse employment action. Likewise, she has not established a genuine issue that the Firm's stated reasons for its decision were pretextual. Thus, we grant summary judgment in favor of Much Shelist on Bilow's retaliation claim.

### C. Bilow's State Law Claims

Bilow also presents several state law claims, including a claim for tortious retaliatory discharge based on her demand for unpaid gross-ups, as well as numerous claims regarding her salary, gross-up, and bonus points. We decline to exercise our supplemental jurisdiction over Bilow's state law claims. Although we recognize the case has been before us for more than one year and discovery is complete, previously we have examined only Bilow's federal claims. More

importantly, Bilow's state law claims present complex policy issues regarding what constitutes wages and how to treat bonus points and insurance pay-backs, as well as apparently undecided legal issues, better resolved by the Illinois state courts. *Van Harken v. City of Chicago*, 103 F.3d 1346, 1354 (7th Cir. 1997) ("The general rule is that when as here the federal claim drops out before trial . . . the federal district court should relinquish jurisdiction over the supplemental claim.").

## CONCLUSION

During the time we have presided over this litigation, we have often sympathized with Bilow's plight. All too often her experience at Much Shelist reflected the difficult life choices faced by many female litigators who are struggling with family and career priorities. Nevertheless, we have concluded that Bilow's federal rights were not violated by Much Shelist. It is unfortunate that Much Shelist could not have shown more sensitivity to Bilow's family situation. However, even if Bilow was treated unfairly, such treatment did not amount to a violation of federal law.

For the reasons stated above, we grant Much Shelist's summary judgment motion, (R. 43-1), and enter judgment against Bilow on her remaining federal claims. Additionally, we decline to exercise our discretionary jurisdiction over Bilow's state law claims. Finally, we deny Much Shelist's motion to strike, (R. 52), as moot. Pursuant to Federal Rule of Civil Procedure 58, we direct the Clerk of Court to enter final judgment in accordance with this opinion.

ENTERED:

District Court Judge Ruben Castillo

Date: May 2, 2000